# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SHONDRA DELOACH-PEREA, on
behalf of herself and her minor child
ELIJAH DELOACH-PEREA-
WINFIELD; and DAVID PEREA**,

        Plaintiffs,

        vs.                                    No. Civ. 07-116 MCA/LFG

**THE CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
and OFFICER JONATHAN MCCRISTON.**

        Defendants.

## MEMORANDUM OPINION AND ORDER

        **THIS MATTER** comes before the Court on *Defendants' Motion to Dismiss Plaintiffs David Perea and Shondra Deloach-Perea's Claims* [Doc. 13], filed April 11, 2007, and *Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint* [Doc. 16], filed April 17, 2007.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants in part and denies in part Defendants' motion to dismiss, and grants Defendants' motion for summary judgment.

## I. BACKGROUND

        The following factual allegations are taken from the *Amended Complaint for Violation of the Fourth Amendment's Right to be Free from Unlawful Seizure and the Fourteenth*

*Amendment's Procedural Due Process Rights* [Doc. 6].  For purposes of Defendants' motion to dismiss, the allegations are accepted as true.  See <u>Erickson v. Pardus</u>, 127 S.Ct. 2197, 2200 (2007).

Plaintiff Shondra DeLoach-Perea ("Shondra") is the mother of Plaintiff Elijah DeLoach-Winfield ("Elijah"), a minor.  She is also the wife of Plaintiff David Perea ("David"), who is Elijah's step-father, and the ex-wife of Michael Winfield.  According to Plaintiffs, at approximately 10:45 p.m. on October 23, 2006, Elijah was asleep in the home he shares with Shondra and David when Defendant Jonathan McCriston, an officer with the Albuquerque Police Department, arrived at the home in the company of Michael Winfield.  Officer McCriston had a temporary order of protection ("TOP"), pursuant to which he removed Elijah from his home and delivered him to his father.  Officer McCriston did not have a warrant and, according to Plaintiffs, no exigent circumstances existed at the time. [Doc. 6 at 1-3].  However, the TOP named Elijah as a petitioner, David (as well as David's son, Jarod) as a respondent, and expressly provided that "[r]espondent shall not write to, talk to, visit or contact the petitioner in any way . . . ." [Doc. 17; Exh. B, "Temporary Order of Protection and Order to Appear" at 1, ¶ 1].  It is undisputed that David was at home with Shondra and Elijah when Officer McCriston arrived.

In their *Amended Complaint* against Officer McCriston, the Albuquerque Police Department,[1] and the City of Albuquerque ("the City"), which they bring pursuant to 42

---

[1]  The Albuquerque Police Department was dismissed as a party by *Order* entered May 2, 2007. [<u>See</u> Doc. 25].

U.S.C. § 1983, Plaintiffs allege that Elijah's removal (1) amounted to a violation of the Fourth Amendment right to be free from an unlawful seizure; and (2) deprived them of their liberty interest in maintaining a family relationship, in violation of the Fourteenth Amendment right to due process. [Doc. 1 at 3-4].  Officer McCriston and the City of Albuquerque now move to dismiss the claims of Shondra and David on the ground that these Plaintiffs lack standing to assert either a Fourth or a Fourteenth Amendment violation.[2] [Docs. 13, 14].  Should the Court deny the motion to dismiss, Defendants have also filed a motion for summary judgment, arguing that Officer McCriston is entitled to absolute/quasi-judicial or qualified immunity, and that, as a result, Plaintiffs' claims against the City must necessarily fail. [Docs. 16, 17].

## II. ANALYSIS

### A. Standards of Review

#### 1. Motion to Dismiss

In order to withstand a motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007).  In handing down Twombly, the United States Supreme Court invalidated the longstanding rule that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff

---

[2]  The motion to dismiss is not intended to address the claims brought by Shondra on Elijah's behalf, as indicated in Defendants' subsequently filed summary-judgment motion. [See Doc. 17 at 2 ("Defendants recognize that Shondra DeLoach does have standing to bring claims on behalf of Elijah DeLoach Winfield . . . .")].

can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley</u>
<u>v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  The Court explained that "after puzzling the
profession for 50 years, this famous observation has earned its retirement." <u>Twombly</u>, 127
S.Ct. at 1969.  In order to survive dismissal under the new standard, a plaintiff must "nudge[
her] claims across the line from conceivable to plausible . . . ." <u>Id.</u> at 1974.  In other words,
"the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in
support of the pleaded claims is insufficient; the complaint must give the court reason to
believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these*
claims." <u>Ridge at Red Hawk, L.L.C. v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007)
(emphasis in original).

### 2. Summary Judgment

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a
motion for summary judgment is made and supported as provided in this rule, an adverse
party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."
Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts
showing that there is a genuine issue for trial." <u>Id.</u>  Judgment is appropriate "as a matter of
law" if the nonmoving party has failed to make an adequate showing on an essential element
of its case, as to which it has the burden of proof at trial.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477

U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

**B.** *Defendants' Motion to Dismiss Plaintiffs David Perea and Shondra Deloach-Perea's Claims* **[Doc. 13]**

The Fourth Amendment to the United States Constitution provides that the Government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend IV. In this case, Plaintiffs allege, in pertinent part, that on October 23, 2006, "[Officer] McCriston arrived at the Plaintiffs' home and, without consent, seized Elijah DeLoach-Winfield, within the meaning of the Fourth Amendment." [Doc. 6 at 3].  As a result, "*Plaintiffs* suffered emotional distress . . . *Plaintiffs* are . . . entitled to punitive damages [and] *Plaintiffs* are . . . entitled to recover the costs of this action." [Id. at 3-4 (emphasis added)]. The Plaintiffs here, as set forth in the caption of the *Amended Complaint*, are Shondra for

herself and on behalf of Elijah, and David. [See id. at 1].

"It is a well-settled principle that standing to assert a Section 1983 claim requires a plaintiff to assert a violation of a constitutional right personal to the plaintiff and not the right of someone else." Murphy v. Bitsoih, 320 F.Supp.2d 1174, 1184 (D.N.M. 2004).  To the extent that Shondra and David assert their own Fourth Amendment claims, those claims must be dismissed because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Hollingsworth v. Hill, 110 F.3d 733, 738 (10th Cir. 1997) (quoting Rakas v. Illinois, 439 U.S. 128 (1978)).  On the other hand, parents may assert their children's Fourth Amendment rights on behalf of those children.  Hollingsworth, 110 F.3d at 738; see also Dubbs v. Head Start, Inc., 336 F.3d 1194, 1203-04 (10th Cir. 2003) (parents could not assert violation of their Fourth Amendment rights based on school's alleged unreasonable search of their children).  Thus, while the Fourth Amendment claims of Shondra and David must be dismissed, the Court reaches a different conclusion with respect to these Plaintiffs' allegations of a Fourteenth Amendment violation.

According to the Amended Complaint, "Plaintiffs were deprived of their liberty interest in their family relationship when Elijah DeLoach-Winfield was removed from their home without notice or hearing."  The Tenth Circuit recognizes a constitutionally protected interest in the family relationship, the intentional interference with which may give rise to a 42 U.S.C. § 1983 action.  See Trujillo v. Board of County Comm'rs of Santa Fe County, 768 F.2d 1186, 1189-90 (10th Cir. 1985) (emphasis added).  Indeed, in Trujillo the Tenth Circuit expressly stated that "an allegation of intent to interfere with a particular relationship

6

protected by the freedom of intimate association is required to state a claim under section

1983." Id. at 1190.

In the instant case, the pertinent allegations in the *Amended Complaint* read as

follows:

> 24. There is a clearly established constitutional right to maintain a family relationship.
>
> 25. Plaintiffs were deprived of their liberty interest in their family relationship when Elijah DeLoach-Winfield was removed from their home without notice or hearing.
>
> 26. Defendants afforded Plaintiffs no process prior to removing Elijah DeLoach-Winfield from their home.
>
> 27. Plaintiff Elijah DeLoach-Winfield's health and safety was never in danger, much less in immediate danger.
>
> 28. Plaintiffs suffered emotional duress as a result of this unlawful interference in their family relationships and are entitled to recover compensatory damages.
>
> 29. Plaintiffs are also entitled to punitive damages because Defendant Jonathan McCriston acted maliciously and willfully.

[Doc. 6 at 4]. Although there is no express allegation of intentional conduct, the Court does

note the allegation that Officer McCriston acted willfully. In other circumstances, the Tenth

Circuit has equated the terms "intentional" and "willful." See Sperry v. McKune, 445 F.3d

1268, 1272 (10th Cir. 2006) (in habeas proceeding, explaining that to act intentionally means

to act purposefully, willfully, and not by accident); Von Lackum v. Allan, 219 F.2d 937, 943

(10th Cir. 1955) (Phillips, C.J., dissenting) ("Willful action means voluntary; by choice;

intentional; purposeful.").   The Court concludes that Plaintiffs' allegation of intent is sufficient to survive Defendants' motion to dismiss and accordingly now addresses the motion for summary judgment.

### C. *Defendants' Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint*

### 1. Absolute/Quasi-Judicial Immunity

In their summary-judgment motion, Defendants contend that Officer McCriston is absolutely (or, alternatively, qualifiedly) immune from prosecution because he did no more than enforce the TOP. [Doc. 17 at 2].  Plaintiffs counter that (1) because the TOP did not authorize Elijah's removal, Officer McCriston is not entitled to absolute immunity, and (2) since any reasonable officer would have so realized, he is not entitled to qualified immunity either. [See generally Doc. 24].

The doctrine of absolute judicial immunity dates to at least 1872, when the United States Supreme Court held that the presiding judge of a court of general criminal jurisdiction could not be "subjected to responsibility for [the commission of a judicial act], however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." Bradley v. Fisher, 80 U.S. 335, 347 (1872).  The Court reasoned that

> it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.   Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be

either respectable or useful. [Moreover], it would establish the
weakness of judicial authority in a degrading responsibility.

Id.

In the years since, the doctrine of absolute immunity has been extended to non-judicial officers (thus the term "quasi-judicial immunity") performing discretionary judicial acts and, in some cases, ministerial acts undertaken at a judge's direction.  See, e.g., Briscoe v. LaHue, 460 U.S. 325, 329 (1983) (witnesses in judicial proceedings); Imbler v. Pachtman, 424 U.S. 409, 423 n. 20, 430-431 (1976) (grand jurors and prosecutors); Whitesel v. Sengenberger, 222 F.3d 861, 867-870 (10th Cir. 2000) (pretrial service officers); Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir. 1988) (deputy court clerk); Coverdell v. Dep't of Soc. and Health Servs., State of Wash., 834 F.2d 758, 764 (9th Cir. 1987) (social worker who sought and obtained court order directing apprehension of newborn girl).   "The rationale for according absolute immunity in the civil rights context is to incorporate traditional common law immunities and to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory § 1983 litigation."  Snell v. Tunnell, 920 F.2d 673, 686-687 (10th Cir. 1990).

In Valdez v. City and County of Denver,[3] the Tenth Circuit approved a "functional" approach to the determination of an individual's entitlement to immunity in § 1983 actions, explaining that immunity "is justified and defined by the *functions* it protects and serves, not

---

[3]  In Valdez, a traffic-court spectator who was held in contempt by the trial judge brought a civil rights suit against the sheriff's deputies and officers who arrested and incarcerated him pursuant to the judge's order.  See Valdez, 878 F.2d at 1286.

9

by the person to whom it attaches." <u>Valdez v. City and County of Denver</u>, 878 F.2d 1285,

1287 (10th Cir. 1989) (*quoting* <u>Forrester v. White</u>, 108 S.Ct. 538, 542, 544 (1988) (emphasis

in original)).  The reason is that

> [c]ourts have long recognized that a litigant dissatisfied with the
> outcome of judicial proceedings will oftentimes accuse his
> "adversaries" of constitutional infirmities.    Because
> controversies sufficiently intense to erupt in litigation are not
> easily capped by a judicial decree . . . the common law provided
> absolute immunity from subsequent damages liability for all
> persons—governmental or otherwise—*who were integral parts
> of the judicial process*.

<u>Id.</u> (emphasis added) (internal citations and quotations omitted). Applying that "functional"

approach, the <u>Valdez</u> Court concluded that "[e]nforcing a court order or judgment is

intrinsically associated with a judicial proceeding[,]" <u>id.</u> at 1288, and accordingly held that

"an official charged with the duty of executing a facially valid court order enjoys absolute

immunity from liability for damages in a suit challenging conduct prescribed by that order."

<u>Id.</u> at 1286.

In the instant case, Plaintiffs attempt to distinguish <u>Valdez</u> by pointing to the Tenth

Circuit's observation that "'every action of the defendants . . . to which Valdez object[ed]

was taken under the direction of a state court judge . . . .'" [Doc. 24 at 4 (*quoting* <u>Valdez</u>, 878

F.2d at 1290)].  By contrast, Plaintiffs argue, "the order which Officer McChriston [sic] was

allegedly enforcing nowhere states that the Court has ordered Elijah . . . to be removed from

his home and from the lawful, court-ordered custody of his mother [and] no judicial order

or court directive directed Officer McChriston [sic] to remove Elijah from the Plaintiffs'

home . . . ." [Doc. 24 at 3-4, 5].

A police officer's entitlement to quasi-judicial immunity is evaluated by reference to the following four-part test. First, the signing judge must have authority to issue the underlying order, such that the judge would qualify for judicial immunity. Second, the order must be facially valid. Third, the officer must have authority to carry out the action. And fourth, the officer must not exceed the order. Moss v. Kopp, --- F.Supp.2d ----, 2007 WL 541807, at *4 (D.Utah, Feb. 16, 2007).

Plaintiffs in this case do not appear to contest either the judge's authority to issue the TOP or Officer McCriston's authority to attempt to enforce it, or the TOP's facial validity. Instead, their position is that Officer McCriston exceeded the terms of the TOP when he removed Elijah from Plaintiffs' home. [See Doc. 24 at 2-3, "Defendant McChriston [sic] did not have a court order or any other documentation supporting Elijah's DeLoach-Winfield's removal [and t]he chief problem with Defendants' arguments is that the order which Officer McChriston [sic] was allegedly enforcing nowhere states that the Court has ordered Elijah Deloach-Winfield, a minor, to be removed from his home and from the lawful, court-ordered custody of his mother."].

The Tenth Circuit has held that "absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its execution." Martin v. Board of County Comm'rs of County of Pueblo, 909 F.2d 402, 405 (10th Cir. 1990). A review of case law on this point reveals that the term "manner of execution" often—but not always—refers to the use of excessive force in

executing the court order.  See, e.g., id. (quasi-judicial immunity unavailable to sheriff's deputies charged with employing excessive force against and ignoring medical needs of individual being arrested on bench warrant); Richman v. Sheahan, 270 F.3d 430 (7th Cir. 2001) (quasi-judicial immunity unavailable to sheriff's deputies charged with using unreasonable force to subdue individual pursuant to judge's order); Sharp v. Kelsey, 918 F.Supp. 1115 (W.D.Mich. 1996) (quasi-judicial immunity unavailable to law enforcement officers who allegedly battered individual they were transporting to jail pursuant to judgment of contempt).

However, in In re Foust, the Fifth Circuit determined that the district court had improperly extended quasi-judicial immunity to sheriff's officials who, in executing a writ of replevin, immediately delivered seized property of the debtors to the claimants.  The debtors argued—and the Fifth Circuit agreed—that the writ, which directed county officials "to immediately seize and take into their possession the property described in the Complaint . . . and to deliver said property to the [claimants] unless bonded by the [debtors,]" was silent as to how long the property should be held in county custody before being turned over. Pointing to a state law that required the sheriff to hold such property for two days before delivering it, the Court explained that "[the sheriff] might infer that he should turn it over immediately, but state law, not a *tabula rasa* reading of the order, should set the presumption in cases of silence."  In re Foust, 310 F.3d 849, 856 (5th Cir. 2002).

In re Foust informs this Court's decision as to Officer McCriston's entitlement to quasi-judicial immunity in the instant case.  The TOP with which Officer McCriston

presented Plaintiffs included a no-contact provision, seemingly[4] prohibiting contact between David and Elijah, but was silent as to the manner by which that provision should be enforced. According to Officer McCriston, before removing Elijah from Plaintiffs' home, "[he] gave Ms. DeLoach Perea the option of leaving the residence with her son to comply with the [TOP]." [Doc. 17; Exh. A, "Affidavit of Jonathan McCriston"].  If, as Defendants contend, Officer McCriston was attempting to enforce the TOP by separating Elijah from David, he could have asked David to leave the residence.  Notably, that section of the TOP that would have expressly authorized the transfer of Elijah from his mother to his father, or directing that temporary physical custody of Elijah be given to Michael Winfield (or anyone else), was left blank. [See Doc. 17; Exh. B at 1, ¶ 5].  In that situation, although Officer McCriston might have inferred that he was authorized to remove Elijah, reference to the Children's Code[5] or even to the custody agreement between Elijah's parents and not Officer McCriston's "*tabula rasa* reading of the [TOP] should [have] set the presumption . . . ."  In re Foust, 310 F.3d at 856.  Because the Court concludes that Officer McCriston exceeded the TOP in removing Elijah, quasi-judicial immunity will be denied.   The Court now addresses Officer McCriston's entitlement to qualified immunity.

_____

[4] On October 25, 2006, another TOP issued, this one providing, in pertinent part, that "[n]o order in [the underlying divorce proceedings] should be construed to prohibit contact between David Perea and Elijah Deloach-Winfield." [Doc. 24; Exh. B, Oct. 25, 2006 "Temporary Order of Protection Against Petitioner and Order to Appear" at 2].  Of course, Officer McCriston did not have the benefit of this clarifying language when he attempted to serve the October 19 TOP on October 23.

[5] See Lucero v. Pino, 946 P.2d 232, 233 (N.M.App. 1997) (explaining that "Children's Code, which provides detailed statutory scheme concerning guardianship and custody of children, provides mechanism whereby a child can be removed from a parent's custody . . . .).

## 2. Qualified Immunity

Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). The key to the qualified immunity inquiry is the "objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998). In analyzing a qualified-immunity claim, the Court first asks whether the plaintiffs have alleged a violation of a constitutional right. Siegert v. Gilley, 500 U.S. 226, 231-232 (1991). If the answer is "yes," the Court next must determine whether the right was clearly established, meaning its

> contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (internal citation omitted). The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains. Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003). Finally, if the law was clearly established, the Court asks whether, in spite of that fact, "'extraordinary circumstances'—such as reliance on the advice of counsel or on a statute—'so prevented [the official] from knowing that his actions were unconstitutional that

14

he should not be imputed with knowledge of a clearly established right." Id. at 1251 (*quoting*

Cannon v. City & County of Denver, 998 F.2d 867, 874 (10th Cir.1993)).

### a. Qualified Immunity and Elijah's Fourth Amendment Claim

In conducting the qualified-immunity analysis, the Court must first consider "whether

[the] allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730,

736 (2002). In this case, Elijah, through his mother, alleges that on October 23, 2006,

Officer McCriston, without a warrant and in the absence of exigent circumstances, seized

him within the meaning of the Fourth Amendment. [Doc. 6 at 3]. The Fourth Amendment

to the United States Constitution provides that "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated." U.S. Const. amend IV. As there is no dispute that Officer McCriston removed

Elijah without a warrant, the Court examines whether exigent circumstances supported the

warrantless removal of Elijah from his home.[6]

Exigent circumstances exist when law enforcement officers have objectively

reasonable grounds to believe that there is an immediate need to protect their lives or the

lives of others. See Cortez v. McCauley, 478 F.3d 1108, 1123-24 (10th Cir. 2007). Officer

McCriston does not seriously contend that exigent circumstances existed in this case, and the

record does not support such a determination. At best, Officer McCriston was working to

---

[6] "Exigent circumstances" is but one exception to the Fourth Amendment's warrant requirement. For other exceptions, not alleged to be relevant here, see 3A FED. PRAC. & PROC. CRIM.3D § 668 (SEARCHES WITHOUT A WARRANT).

facilitate an abuse investigation that he confirmed had been opened by the state's Children Youth and Families Division ("CYFD"). [See Doc. 17; Exh. A, McCriston Affidavit at 2 ("I called CYFD and verified that there was an open investigation into alleged abuse occurring within the household of Mr. Winfield's ex-wife."). But this Court will not "equat[e] the investigation of a possible victim of child abuse with an exigent circumstance absent evidence of 'reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat.'" Franz v. Lytle, 997 F.2d 784, 792 (10th Cir. 1993) (quoting Good v. Dauphin County Social Servs., 891 F.2d 1087, 1094 (3rd Cir.1989)). And the record in this case does not support a determination that Elijah was in immediate jeopardy. To the contrary, the evidence reveals that when Officer McCriston arrived at Elijah's home, Elijah was asleep in his bed. Also, while the TOP listed both Jarod and David Perea as respondents who were supposedly to have no contact with Elijah, Officer McCriston understood that the CYFD investigation involved allegations of abuse by Jarod. Finally, although Officer McCriston understood the TOP's terms to prevent Elijah's being left alone with Jarod Perea, there is no allegation that Jarod was in the house when Officer McCriston arrived, much less that he was alone with Elijah. Given these circumstances, Officer McCriston's warrantless seizure of Elijah amounted to a Fourth Amendment violation. The Court must now determine whether the right at issue was clearly established, such that a reasonable person would understand that his conduct violated the law.

Normally, where the law was clearly established, the defense of qualified immunity fails, "since a reasonably competent public official should know the law governing his

conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-819 (1982).  Still,

> if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.  In other words, a civil rights defendant is entitled to "fair warning" that his conduct deprived his victim of a constitutional right.

Roska, 328 F.3d at 1247 (internal quotations omitted).   However, "a showing of unreasonableness is difficult in a situation in which a law enforcement officer is acting pursuant to a court order." Nicholson v. Moates, 159 F.Supp.2d 1336, 1351 (M.D.Ala. 2001) (*citing* Soldal v. Cook County, 506 U.S. 56, 71 (1992)).

Plaintiffs rely heavily on Roska in arguing that Officer McCriston should be denied qualified immunity, but Roska is distinguishable inasmuch as it involved 12-year-old Rusty Roska's removal from his family and subsequent placement in state custody by social workers who were acting without a warrant or any other sort of court order.  See Roska, 328 F.3d at 1238.   The Tenth Circuit affirmed the district court's determination that the defendants were entitled to qualified immunity with respect to their warrantless seizure of Rusty.  Beginning with the proposition that its "jurisprudence has long recognized that a person's privacy interest is at its highest in a person's home[,]" the Court explained that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Roska, 328 F.3d at 1248 (*quoting* Payton v. New York, 445 U.S. 573, 590 (1980)).  Nevertheless, the

Court went on to state that "[o]n the other hand, we have made certain statements, albeit in *dicta*, that could be construed as drawing distinctions between (1) child-abuse investigations and other types of investigations and (2) social workers and law-enforcement officers." Roska, 328 F.3d at 1249. As examples, the Court compared Snell v. Tunnell, in which it declined to decide whether a search by police and social workers of a private home without a warrant or probable cause violated the Fourth Amendment, noting that "[c]ourts ha[d] reached differing results concerning the difficult issue of the scope of the [F]ourth [A]mendment protection in the context of a child abuse investigation[,]" Snell v. Tunnell, 920 F.2d 673, 697 (10th Cir. 1990), with Franz v. Lytle, in which it held that a police officer could not enter a house to investigate potential child abuse without a warrant. See Franz, 997 F.2d at 179-792. Because "[t]aken together, Franz and Snell injected a degree of uncertainty into an otherwise staple rule of Fourth Amendment jurisprudence: absent exigent circumstances, the state may not enter an individual's home without a warrant[,]" the Circuit concluded that the constitutional question as to the requirement of a warrant was "by no means open and shut" at the time of Rusty's seizure. Roska, 328 F.3d at 1249. However, with the issuance of Roska, the law became clearly established, as evidenced by the Circuit's statement that "henceforth, the law is now clearly established that, absent probable cause and a warrant or exigent circumstances, *social workers* may not enter an individual's home for the purpose of taking a child into protective custody." Id. at 1250 n.23 (emphasis added).

Roska, however, would not necessarily have given Officer McCriston fair warning that his conduct in seizing Elijah deprived Elijah of his Fourth Amendment right to be free

18

from an unreasonable seizure, since Roska's focus was clearly on social workers. Additionally, the defendant/social workers in Roska seized Rusty Roska without a warrant or any other court order.  By contrast, in this case, Officer McCriston was acting pursuant to the TOP, and while it may be unclear what, precisely, the TOP authorized with respect to enforcing its no-contact provision, (1) there is no allegation that the TOP was not a facially valid court order, and (2) as previously explained, it is difficult to establish unreasonableness where a law enforcement officer acts pursuant to a court order.  Nicholson, 159 F.Supp.2d at 1351.[7]  Accordingly, the Court concludes that Plaintiffs have failed to meet their burden

---

[7]  In Nicholson, qualified immunity was extended to a sheriff who relied upon—and deputies who assisted in the execution of—a court order purportedly allowing an ex-husband to enter the marital residence occupied by his ex-wife and remove certain property.  However, the order, which was signed by state Circuit Court Judge Thomas Head, did not specify the property to be removed, nor did it authorize anyone from the sheriff's department to accompany the ex-husband to the home to effect the removal. The authorization for the sheriff's department's accompaniment, as well as the property to be removed, was apparent only when the order was read in conjunction with an attached motion, which was originally filed in a protection-from-abuse case, which case was later consolidated with divorce proceedings before Judge Head.  In analyzing the defendants' claim to qualified immunity (after having denied them quasi-judicial immunity) the district court explained:

> The factual circumstances of this case are unusual in that this is not a case in which law enforcement acted on a document which ultimately proved to be inaccurate, or in which they erroneously applied a document, or failed to verify a fact which resulted in the seizure of the wrong person's property. Instead, it is still unclear, even after the parties have asked Judge Head in his deposition about what he intended by his order, what the intent of the order was. The Plaintiff argues that Judge Head never intended for [ex-husband] to get property of the marital res and would not have allowed [him] to take possession of [ex-wife's]. As Judge Head opined, however, the law enforcement officers were left to interpret what was meant by the order stating that the motion was granted. There was no other motion in the protection order case to which reference could have been made. This court must conclude, therefore, that [the sheriff's] reliance on the order and motion was

Case 1:07-cv-00116-MCA-LFG   Document 34   Filed 03/31/08   Page 20 of 27

of pointing to case law clearly establishing that Officer McCriston violated Elijah's Fourth Amendment rights.

### b. Qualified Immunity and the Plaintiffs' Fourteenth Amendment Claims

Plaintiffs also assert that their rights under the Fourteenth Amendment were violated in that they were deprived of a protected liberty interest in their family relationship without due process of law when Elijah was removed from their home without notice or hearing. [Doc. 24 at 10].  Parents have a fundamental and protected liberty interest in the care, custody, and control of their children, and the state may not deprive parents of this liberty interest without providing a fair procedure for the deprivation.  Gomes v. Wood, 451 F.3d 1122, 1127 (10th Cir. 2006).  Indeed, "[r]emoval of children from the custody of their parents requires predeprivation notice and a hearing "'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'"  Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989) (*quoting* Smith v. Org. of Foster Families for Equality and Reform, 431 U.S. 816, 848 (1977)).  While

---

> reasonable and the deputies' accompanying [ex-husband] to obtain the listed property was not a constitutional violation. Even if [the sheriff] should have checked to see if the motion with the order was the motion which had been filed in the protection order case, had he done so, he would have found that the motion filed in the protection order case was the same in substance as the motion which accompanied Judge Head' order to the sheriff' department. The order refers to the motion and states that it is granted.

Nicholson, 159 F.Supp.2d at 1349-50 (internal citations omitted).  So too, in this case, Officer McCriston was left to interpret what was intended by an order containing a no-contact provision between Elijah and David Perea, but failing expressly to state that physical custody of Elijah was to be transferred out of the home he shared with his mother and David.

these "extraordinary situations" include emergency circumstances posing an immediate threat to the safety of a child, "the 'mere possibility' of danger is not enough to justify a removal without appropriate process." Roska, 328 F.3d at 1245 (*quoting* Tenenbaum v. Williams, 193 F.3d 581, 594 (2nd Cir.1999)).  In other words, a child may be removed from his home without prior notice and a hearing when there exists "a reasonable suspicion of an immediate threat to the safety of the child if he . . . is allowed to remain there."  Gomes, 451 F.3d at 1130.

Viewing the evidence in the light most favorable to Plaintiffs, see Saucier v. Katz, 533 U.S. 194, 201 (2001), this Court determines that genuine issues of material fact exist as to whether Officer McCriston had reasonable suspicion to remove Elijah prior to a hearing. First, although the TOP lists both David and Jarod Perea as respondents, the fact that it also explicitly provides that "*Jarod Perea* may not abuse Elijah in any way [and that] *Jarod Perea* shall not be left alone with Elijah Deloach-Winfield at any time, nor may *Jarod* verbally abuse Elijah[,]" would reasonably indicate that any real threat to Elijah came from Jarod, not David.  [Doc. 17; Exh. B (emphasis added)].  Additionally, there is no indication from the record evidence that Jarod was in the house with Elijah (who was in bed, asleep, when Officer McCriston arrived), much less *alone* in the house with Elijah, which would tend to indicate that Elijah was not at risk of immediate harm.  Finally, that section of the TOP that would have specifically authorized the temporary transfer of Elijah from one parent to the other (or to anyone else) was left blank.  [See Doc. 17; Exh. B at 1].  Thus, viewed in the light most favorable to Plaintiffs, the record supports their contention that Officer

McCriston removed Elijah in the absence of "a reasonable suspicion of an immediate threat to [Elijah's] safety" should he have remained in Plaintiffs' home.  See Gomes, 451 F.3d at 1135.  The next question is whether a reasonable police officer in Officer McCriston's circumstances would have understood that his conduct violated Plaintiffs' due process rights.  For "if officers of reasonable competence could disagree" about the lawfulness of the challenged conduct, then "[qualified] immunity should be recognized." Malley, 475 U.S. at 341.

The Court determines that a reasonable police officer, if presented with the relevant information with which Officer McCriston was presented, could reasonably have believed that there was an immediate threat to Elijah's safety if he were allowed to remain in Plaintiffs' home.  For one thing, unlike in Roska, on which Plaintiffs rely in support of their position that qualified immunity is unavailable under the circumstances, Officer McCriston transferred Elijah from his mother to his father pursuant to what he understood to be a term of a facially valid, judge-signed court order.  In this respect, Officer McCriston's action resembles that of Deputy Arnold Hill in Hollingsworth, who similarly turned over children from mother to father in accordance with what he believed was required by the terms of an *ex parte* protective order that failed explicitly to authorize a custodial transfer.  As in Hollingsworth, in this case, the TOP "was entitled a protective order [and its] use of the word 'protective' to describe its function no doubt connoted its common sense meaning—a judge had signed a valid court order that [Elijah], [a] named [petitioner] on the document, w[as] in need of some kind of protection." Hollingsworth, 110 F.3d at 741.  Just as Deputy Hill's

knowledge of his case was limited to the information contained in the protective order he was attempting to serve, so too was Officer McCriston's knowledge of his case gleaned from the TOP, from which he learned, among other things, that Jarod and David Perea were not to have contact with Elijah. [Doc. 17; Exh. A, McCriston Affidavit at ¶ 10].  The TOP itself states that

> [t]he court has reviewed the sworn petition alleging domestic abuse.  The court having considered the petition, **FINDS** that the court has jurisdiction, that there is probably cause to believe that an act of domestic abuse has occurred and that petitioner or a household member of petitioner will suffer immediate and irreparable injury, loss or damage unless the court enters this order.

[Doc. 17; Exh. B at 1].

When Officer McCriston went to serve the TOP, he saw that David Perea, a named respondent ordered not to have contact with Elijah, was at the house.  Before removing Elijah, Officer McCriston called CYFD and verified that there was an open investigation into alleged abuse occurring within Elijah's home. [Id. at ¶ 11].  Officer McCriston also sought the advice of his sergeant, who advised him to turn Elijah over to his father. [See Doc. 24; Exh. D, April 4, 2007 letter from Assistant City Attorney Stephanie Griffin].  Although there are instances in which qualified immunity has been rejected, they generally involve circumstances in which "officers of reasonable competence," Malley, 475 U.S. at 341, would agree that an immediate threat to the safety of a child did not exist.  See, e.g, Wooley v. City of Baton Rouge, 211 F.3d 913, 924 (5th Cir.2000) (police officers who removed child from home were not entitled to qualified immunity because "[t]here is no indication in this record

of any threat to [the child's] safety, nor were the officers investigating allegations that he previously had suffered abuse"); Malik v. Arapahoe County Dept. of Soc. Servs., 191 F.3d 1306, 1314-15 and n.5 (10th Cir. 1999) (affirming denial of qualified immunity based on public officials' acknowledgment that child was not in imminent danger of abuse). In this case, the Court concludes that, given the circumstances, police officers of reasonable competence could disagree as to whether Elijah should or should not have been removed; for this reason, Officer McCriston is entitled to qualified immunity and, therefore, the entry of summary judgment in his favor.[8, 9] Absent

---

[8] This Court's determination that the actions of Officer McCriston were reasonable under the circumstances should *not* be taken to mean that the Court is not extremely troubled by what transpired in this case. Michael Winfield's procurement of a temporary order of protection as a means of removing Elijah from his mother's custody appears to have been a clear attempt to circumvent existing child-custody procedures. This much is clear from the subsequently issued TOP of October 25, 1006, which explicitly states that "[n]o order in [the underlying divorce action] shall be construed to prohibit contact between David Perea and Elijah Deloach-Winfield" and directing Michael Winfield to file a motion for Elijah's custody. [Doc. 24; Exh. B, Oct. 25, 2006 "Temporary Order of Protection Against Petitioner and Order to Appear" at 2]. Whereas temporary orders of protection such as the one presented to Officer McCriston issue out of the Family Violence Protection Act, §§ 40-13-1 to 40-13-8, NMSA 1978], child-custody determinations normally derive from the Domestic Relations Rules and the Domestic Affairs Code. To be sure,

> [p]roceedings under the Family Violence Protection Act are independent of other domestic relations cases. §40-13-3(E). The petitioner should inform the court at the outset of the pendency of other domestic cases. §40-13-3(C). *If temporary protection requires alteration of an existing order of custody or support, the temporary order should say so. §40-13-5(C). The order should plainly inform the parties of the need to address such issues in the domestic relations forum*

DOMESTIC VIOLENCE BENCHBOOK, § 4.22 "Transfer of Issues Where Other Custody Cases Are Pending" (emphasis added) (see http://jec.unm.edu/resources/benchbooks/dv/ch_4.htm#422). Indeed, child-custody transfers pursuant to orders of protection should be done only sparingly. See Lucero, 946 P.2d at 233 ("Among other possible actions a court can take when a petition is

filed under the Protection Act, the court may enter a temporary award of child custody. *This custody order, however, is limited in duration and is not designed to be a substitute for other proceedings related to child custody.*") (emphasis added) (internal citation omitted); see also 1978 NMSA §§ 40-13-5(C) and 40-13-6(B) (explaining, respectively, that (1) if another action relating to child custody is pending or has been completed, an initial order under the Protection Act may be entered, but the custody matter must then be transferred to the court having jurisdiction over the pending or prior action and (2) an order under the Protection Act involving custody or support shall be effective for a fixed period of time not to exceed six months). In fact, the New Mexico Court of Appeals has expressed "grave" concerns when the Protection Act has been used in lieu of a substitute for a custody proceeding. See Lucero, 946 P.2d at 235. Returning to the facts of the instant case, however, because of the confusing manner in which the October 19th TOP was completed (*i.e.*, listing David Perea as a respondent and purporting to order no contact between him and Elijah, but crossing out that section specifying, among other things, that "[r]espondent shall not go within 100 yards of the petitioner's home or . . . of the petitioner . . . ."  and failing to fill out that section that would have expressly transferred custody of Elijah), it was reasonable for Officer McCriston to believe he was authorized by the TOP to remove Elijah from his home. In short, the Court declines to hold Officer McCriston responsible for the maneuvering of Michael Winfield and the lack of attention to detail shown by the Special Commissioner in completing the TOP.

[9] Along with their *Response* to Defendants' summary-judgment motion, Plaintiffs filed a Rule 56(f) affidavit, in which they sought, among other things, to depose Officer McCriston; the police sergeant to whom he spoke before removing Elijah; and Michael Winfield "regarding the circumstances surrounding the filing of the Temporary Order of Protection, review of such order, and decision process to remove Elijah Deloach-Winfield, a minor child, from his home and from the lawful and legal custody of his mother." [Id. at 2]. By *Order* of May 15, 2007, the Magistrate Judge denied Plaintiffs' request for discovery  [Doc. 27]. On January 23, 2008, this Court held a hearing at which counsel for Plaintiffs represented that Officer McCriston was aware of a

> two[-]year no[-]contact order that Ms. Perea had against Mr. Winfield that mandated that he be at least 100 feet or 100 yards from her house and the officer actually brought Mr. Winfield in violation of that order right to the front of her house while he went and removed the child from her house. Even given the circumstances of what was going on in the home we don't think that's reasonable and we also don't think it's reasonable given the totality of the circumstances that the officer was made aware of or the officer should have made the sergeant aware of.

> So we definitely do not think that's reasonable and we think that if discovery were allowed to proceed in this case I think we could

Officer McCriston's individual liability, there can be no municipal liability.  See Thompson v. City of Lawrence, Kan., 58 F.3d 1511, 1517 (10th Cir. 1995) (municipal liability will not attach if there are no underlying constitutional violations by city officers).  For this reason, summary judgment also will be entered in favor of the City.

### III. CONCLUSION

Because of a lack of standing, the Fourth Amendment claims asserted by Plaintiffs Shondra DeLoach-Perea and David Perea must be dismissed.  While the Fourth Amendment claim asserted on behalf of Plaintiff Elijah DeLoach-Winfield, as well as the Fourteenth Amendment claims of all Plaintiffs, survive Defendants' motion to dismiss, for the reasons explained above, those claims cannot survive Defendants' motion for summary judgment.

**IT IS, THEREFORE, ORDERED** that *Defendants' Motion to Dismiss Plaintiffs David Perea and Shondra Deloach-Perea's Claims* [Doc. 13] is **GRANTED IN PART and DENIED IN PART**;

**IT IS FURTHER ORDERED** that *Defendants' Motion for Summary Judgment*

---

> show [an] unreasonable . . . course of action and *there's other factors we don't know.  Whether [Officer] McCriston and Mr. Winfield had a relationship.  Ms. Perea has some ideas that he's made representations that he has friends in APD, "I can have my friends go take Elijah back,"* and we just need an opportunity to explore those issues further.

[Transcript of Jan. 23, 2008 hearing (emphasis added)].  Assuming without deciding that Michael Winfield did, in fact, make the suggested statements, even a showing that he colluded with Officer McCriston to seize Elijah would not alter the reasonableness of Officer McCriston's actions, which ultimately were undertaken pursuant to a facially valid court order.

*Requesting Dismissal of Plaintiffs' Complaint* [Doc. 16] is **GRANTED**.

     **SO ORDERED** this 31st day of March, 2008, in Albuquerque, New Mexico.


                    **M. CHRISTINA ARMIJO**
                    United States District Judge

27